## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ALBERT HINDS,                                        )
                                                     )
                        Plaintiff,                   )
                                                     )       **CIVIL ACTION**
v.                                                   )
                                                     )       **No. 05-2362-KHV**
SPRINT/UNITED MANAGEMENT                             )
COMPANY, et al.,                                     )
                                                     )
                        Defendants.                  )
_____ )

## MEMORANDUM AND ORDER

Albert Hinds brings suit against Sprint/United Management Company and Sprint Nextel Corporation (collectively "defendant" or "Sprint"), alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #38) filed August 11, 2006. On December 11, 2006, the Court ordered the parties to submit additional briefing regarding plaintiff's age discrimination claim. See Order (Doc. #49). For reasons stated below, the Court sustains defendant's motion with respect to plaintiff's retaliation claim.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute

requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  Rule 56(e) also requires

2

that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served

therewith." To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards

those portions which are not shown to be based upon personal knowledge or otherwise do not

comply with Rule 56(e). Maverick Paper Co. v. Omaha Paper Co., Inc., 18 F. Supp.2d 1232, 1234-

35 (D. Kan. 1998).

### Facts

The following facts are either uncontroverted or, where controverted, construed in the light

most favorable to plaintiff:[1]

On October 3, 1994, plaintiff began working for Sprint as a senior supervisor. Throughout

his employment, plaintiff consistently received merit pay increases. In 1995 and 1996, plaintiff

received a written performance rating of two.[2] In 1997, plaintiff received a performance rating of

one. During 1997, plaintiff led the top team on the One Sprint sales center. In May of 1997, plaintiff

became a supervisor in resource management. In 1998, plaintiff organized and formed a One Sprint

Workforce Management ("WFM") Team, pulling WFM leaders from all areas of the company. In

September of 1998, Sprint promoted plaintiff to project manager III, a grade 76 position. For 1998,

plaintiff received a written performance rating of one. For 1999, plaintiff received a written

performance rating of two. In June of 2000, Sprint promoted plaintiff to manager I in business

---

[1]        The Court does not consider facts which the record does not support. In addition, the Court does not consider facts which the parties include only in the argument section of their briefs and not in the statement of facts as required by D. Kan. Rule 56.1.

[2]        Plaintiff does not explain the performance rating scale, see Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Opposition") (Doc. #44) filed September 11, 2006 at 9, but other factual assertions suggest that the scale included ratings from one to five, with one being the best and five the worst.

development, at grade level 77. For 2000, plaintiff received a written performance rating of three.

At the end of October of 2001, Ted Smith, Sprint manager, started a WFM group to more efficiently manage call centers and call volume around the country. At the time, Sprint was divided into three divisions: local, long-distance and wireless. The WFM group serviced the business wholesale markets of the local division.

On October 31, 2001, Sprint assigned plaintiff to project manager IV in the WFM group, at grade level 77. In this position, plaintiff was responsible for the operation of several call centers. Around the same time, another Sprint employee, Dave Roberson, joined the WFM group at grade level 78. Roberson had worked for Sprint since 1993, most recently as a management employee in another group at grade level 79. Smith managed the WFM group. John Schuler, WFM director, supervised Smith.[3] Jim Curran served as vice president over the WFM group.

Smith outlined a set of goals for plaintiff in the WFM group. Plaintiff attained the goals and effective May 6, 2002, Smith advanced him to project manager V at grade 78 and expanded his responsibilities. Soon thereafter, Smith became concerned that although plaintiff was very competent technically, he had problems communicating with peers and customers. Smith thought that plaintiff was not adapting quickly to the negotiation process with different call centers and was not effectively establishing partnerships with the call centers. Smith's concerns centered less on whether plaintiff could meet the objectives for his position, and more on how plaintiff went about meeting those objectives.

On June 27, 2002, Smith provided feedback to plaintiff in a LINK 360, a performance evaluation tool which provides feedback from employees within 360 degrees around an individual,

_____

[3]     Some time thereafter, Marty Olinde replaced Schuler as WFM director.

4

ranging from direct reports to supervisors.[4]  On a scale of one to five, with one being the best and

five the worst, Smith gave plaintiff the highest ranking (one) in six categories: works toward win/win

solutions whenever possible; finds new ways to maximize profits whenever possible; uses teams to

address key issues when appropriate; wins support from others; involves others in shaping plans and

decisions that affect them; and encourages cross-functional work between departments and business

units.  Smith rated plaintiff two in 11 categories: makes it easy for cross-functional teamwork and

collaboration to occur; listens willingly to concerns expressed by others; asks others for input when

solving problems; inspires people to excel; provides clear direction and defines priorities for the

team; increases market share by maximizing customer perception of value; seeks feedback from

customers; understands complex concepts and relationships; translates business strategies into clear

objectives and tactics; anticipates how other cultures/countries react to the organization's strategies

and products; and is regarded as an expert.  Smith ranked plaintiff three in 23 categories: confronts

problems early, before they get out of hand; acts decisively; speaks clearly and concisely; makes

timely decisions; gives compelling reasons for ideas; develops and implements plans in support of

market share growth and/or unit cost reduction; shows consistency between words and actions;

handles multiple demands and competing priorities; gains the trust of others; fosters the development

of a common vision; conveys clear expectations for assignments; works to anticipate customer/client

needs; knows when to supervise people and when to leave them on their own; is accessible to

provide assistance/support as necessary; continually improves procedures, products and/or services;

coaches others in the development of their skills; works constructively under stress and pressure;

---

[4]        A LINK evaluation involves two main components.  First, it evaluates an employee's
objective results.  Second, it evaluates an employee's behavioral dimensions, i.e. how an employee
interacts with others and the manner in which an employee performs his or her job.

continually searches for ways to improve customer/client service; treats people with respect; gathers relevant information systematically; compromises to build give-and-take relationships with others; takes appropriate risks to increase market share; uses statistical and quantitative information to ensure quality; develops strategies and tactics to enhance the organization's competitiveness; and understands how the business is run.  Smith rated plaintiff four in ten categories: develops effective working relationships with direct reports; makes sound decisions based on adequate information; continually learns and applies new skills; initiates activities without being asked to do so; clearly expresses ideas and concepts in writing; prepares written communication efficiently; gives people specific and constructive feedback; makes efficient use of time; empowers others with the authority necessary to accomplish their objectives; and expresses disagreement tactfully and sensitively.[5]

Plaintiff thought that Smith's assessment of him was incorrect, and that Smith's grading paradigm was not in line with his own paradigm.  Plaintiff believed that he and Smith were not communicating well.  Plaintiff also believed that he had communication challenges with another co-worker, Retha Deaton.

On July 23, 2002, plaintiff received an e-mail in which a Sprint employee named Joni Lindquist referred to someone as "Howdie."  A month later, on August 19, 2002, plaintiff complained to the human resources department ("HR") that Lindquist's reference to "Howdie" was a personal attack on him, referring to plaintiff as "Howdy Doody."  Plaintiff waited to complain because he wanted to calm down and try to view the situation rationally and objectively.  Two days later, plaintiff learned that the e-mail referred to an employee named Howdie Conley.

_____

[5]      Smith did not give plaintiff a five rating in any category. The LINK 360 form provided a ranking of six, which reflected that the evaluator had no opinion as to a category.  Smith ranked plaintiff six in one category: stays informed about industry practices and new developments.

6

In September of 2002, Smith learned that plaintiff was using his company credit card for personal purchases such as gasoline and groceries. Smith counseled plaintiff to stop using the credit card for such purchases and warned him that failure to do so would result in discipline up to and including termination. Smith understood that plaintiff had been operating under a different policy regarding credit card use and did not place him on any type of corrective action.

In October of 2002, Smith transferred to another group within Sprint and chose Roberson to serve as acting WFM manager. Smith chose Roberson because he believed that Roberson could deal with subordinates, peers, supervisors and customers in a way that would promote teamwork and partnership. The fact that Roberson had previously been a grade 79 manager also influenced Smith. Smith did not post the position, i.e. he did not advertise the position for applications and interviews. Plaintiff felt that in choosing Roberson, Smith had made a decent choice.

Around the end of October of 2002, Krystal Barr replaced Olinde as director of the WFM group.

In the fourth quarter of 2002, Smith nominated plaintiff for a "Sprint value excellence award." Plaintiff received the award from Jim Curran, vice president over the WFM group

In May of 2003, Barr changed Roberson's status from "acting" WFM manager to "official" WFM manager. Barr thought that Roberson had been performing the duties of the position well since Smith's departure. Barr did not post the job opening.

Several of plaintiff's peers and clients complained to Roberson and Barr about plaintiff. Many complained that plaintiff was too pushy and dictatorial, and that he did not listen to them or accept their input and feedback. Another common complaint was that plaintiff sent criticism up the chain of command to senior level management without first trying to work with his peers.

For example, on May 13, 2003, Larry Arnold, a WFM group customer, asked plaintiff to consult with him before sending e-mails to Curran about issues that impacted his group. Arnold asked for an opportunity to discuss the matter with plaintiff. Instead of meeting with Arnold, plaintiff e-mailed Curran stating, among other things, that some of his peers, managers and customers had a "novice" WFM perspective. Plaintiff further stated, "If I have been difficult to work with, much of it is my unwillingness to yield on tried and true WFM principles."

Curran instructed Barr to make sure that plaintiff took his ideas and criticism to his peers and customers first, in order to work through issues constructively as a team. Barr felt that plaintiff's complaints to Curran reflected poorly on the WFM group's ability to work together as a team and partner effectively with its customers, e.g. the call centers, when challenges arose. Barr counseled plaintiff that he was too pushy and instructed him to stop sending work-related e-mails to senior management, including Curran.[6] Plaintiff refused to comply because Barr could not show him an official Sprint policy which prohibited him from communicating to management.

On another occasion, a customer in a call center in Mansfield, Ohio asked plaintiff to attend a meeting. Plaintiff declined. Barr told him to reconsider and attend the meeting. Plaintiff again refused, stating that he "cannot, in good conscience, spend money on this." Plaintiff did not attend the meeting.

Plaintiff felt that he had a different management paradigm than Barr and Roberson. Plaintiff believed that as long as he met objective goals, how well he got along with peers or management should not matter. Plaintiff thought that Sprint should evaluate him based on objective results and on how his subordinates rated him, and not on how his superiors rated him. Barr and Roberson

---

[6]     Although Barr counseled plaintiff regarding the complaints, she did not give him a verbal or written warning or any other type of corrective action.

believed that plaintiff was strong in technical capabilities and strategic thinking on WFM issues, but weak in how he dealt and communicated with others.

On June 6, 2003, plaintiff met with Rich Joyce, HR representative, regarding the appointment of Roberson as WFM manager.  Plaintiff complained that Sprint should have posted the position before filling it.  Plaintiff asked whether Sprint did not post the job because of his complaints about the rating system or because of age discrimination.  At the time Barr appointed Roberson, Roberson was 42 years old and plaintiff was 48 years old.[7]

On June 7, 2003, plaintiff sent Gary Forsee, Sprint CEO, an e-mail titled "feudalism, fear and stagnation vs. freedom, empowerment and growth."  In the e-mail, plaintiff raised concerns regarding Sprint's alpha rating system, including plaintiff's belief that the system encouraged managers to "manage up" versus "manage down."  In the e-mail, plaintiff referred to his age in the following context:

> I am significantly older than many of [my managers], have more business experience and more education.  I refuse to align with a business decision that I know is wrong, based on my experience and knowledge.  This is bad politics and it has sometimes hurt me.  I once had a Sprint director who I reported to, tell me that at Sprint, "you get promoted via politics vs. performance."  Turns out she was right.

Plaintiff's Exhibit L.  Attached to the e-mail, plaintiff included prior e-mails to Joyce dated May 20 and 30, 2003, and a picture of plaintiff's family.  Plaintiff did not mention age discrimination.

In September of 2003, Roberson provided plaintiff feedback in a LINK 360 evaluation, which rated him below average in several categories.  When plaintiff received the evaluation, he e-mailed Joyce stating that he was upset because Roberson had rated him too low.  Joyce responded by encouraging plaintiff to use the evaluation as a tool for constructive criticism and talk to Roberson

---

[7]     Plaintiff was born on June 3, 1954 and turned 49 on June 3, 2003.

about it.  Plaintiff responded as follows:

> Good answer Rich.  I spoke with [Roberson] already today and we are closer to understanding.  I just need to understand why the gap between he [sic] and the others who responded is so large.  I expect him to back up his perceptions with facts.  His leadership and management paradigm is vastly different than mine and mine appears to align well with my direct reports, peers and others based on the Link 30 feedback.
> * * *
> I would much rather see a gap between [Roberson] and I [sic] than between my direct reports and I [sic].  They are my primary customers and I see [Roberson] as a support person to ensure the customers needs are being met.  If I tried to alter my management and leadership style to mirror [Roberson's], my direct reports/customers, would not be happy.  This is what many managers attempt to do though.  They manage up vs. manage down.

Defendant's Exhibit L.

In October of 2003, plaintiff believed that a Sprint employee was helping to out-source jobs to another company.  Plaintiff reported the conduct to Jim Kissinger, head of HR.  In fact, the employee had been interviewing for employment with an outside company.

On November 18, 2003, plaintiff sent an e-mail to Joyce titled "For the Record."  In the e-mail, plaintiff raised concerns regarding the alpha rating system and his low performance rating.  Plaintiff also expressed concerns regarding Sprint's compliance with the Vietnam Era Veterans Readjustment Assistance Act of 1973.  Plaintiff did not mention age discrimination.

In late 2003, Sprint underwent a reorganization to combine its three operating divisions into one.  Under the reorganization, Sprint consolidated the WFM group to provide services to all Sprint divisions.  Barr selected Mark Justice to serve as grade 79 manager in the consolidated WFM group.  Plaintiff faced involuntary termination of his employment as part of a reduction in force ("RIF") at the end of 2003.

Also, as part of the reorganization, Sprint created the call center tools, technology and evolution group (the "CCTTE group"), for long-term strategic planning regarding call centers.

Sprint appointed Marian Fields as manager and Joe Modica as director over the group.  Barr contacted Modica and recommended plaintiff for a position in the CCTTE group.  Barr considered plaintiff a subject matter expert in the field of workforce management.  Although Barr believed that plaintiff had serious challenges with interpersonal communications, she praised his technical skills and believed that he was strong in call center strategic planning.  Based on the recommendation, Modica chose plaintiff as the best qualified candidate for the position.  In November of 2003, Sprint offered plaintiff a grade 77 position in the CCTTE group.  Plaintiff accepted the offer effective January 1, 2004.

On January 1, 2004, plaintiff began working in the CCTTE group along with four other employees:  Marcia Jacobson (d/o/b 9/26/1968); Sherri Rigdon (d/o/b 12/30/1951); Betty Yeager (d/o/b 7/23/1948); and Mark Smith (d/o/b 10/16/1949).  Plaintiff was the second youngest person in the group.

In January of 2004, Roberson evaluated plaintiff's performance for 2003.  At the time, the LINK evaluation allowed employees an overall rating of the following categories: M (most effective); H (highly effective); V (very effective); L (less effective); N (not yet rated).  Roberson gave plaintiff an overall rating of  "L."  In the supervisor comments section, Roberson wrote the following:

> Al is a Work Force Management Expert, a strong strategic thinker, who does a good job targeting the ideal state.  Throughout the year, Al was 'high maintenance' requiring high-level management and HR time.  During feedback sessions, leadership perceptions were debated.  Too many issues became Win/Lose In [sic] his new role.  Al will have the opportunity to take his 'Strategic' strengths and help improve all of Sprint Business.

Defendant's Exhibit P.

After plaintiff received the evaluation, he prepared a power point presentation entitled "Alpha

Rating System: Move From Good To Great By Aligning The System For Great Results Or Lose The Great Employees," which outlined his concerns regarding the alpha rating system.[8]  Plaintiff thought that the system was too subjective, placed too much emphasis on employee personalities and relationships, and encouraged "managing up" versus "managing down."  In the presentation, plaintiff stated that he believed that Sprint had moved him out of his former position in retaliation for his taking issues to HR and upper management.  See Defendant's Exhibit T.  The presentation did not mention age discrimination.

On January 14, 2004, plaintiff e-mailed Joyce regarding Roberson's review.  Plaintiff stated as follows:

> I find it disappointing that when one solicits the assistance of HR on issue's [sic] that clearly run counter to the Sprint published requirements and guidelines, the individual is deemed "high maintenance."
> *       *       *
> As noted in previous communication to you . . . Krystal Barr informed me that Mr. Curran viewed me as high maintenance.  Why?  Because I went to HR with good reason.  Why did I go to HR?  Because I believed HR would stand behind corporate policy.  Instead, I found HR stands behind the executive.  Where is the integrity?

Plaintiff's Exhibit T.  Plaintiff sent a copy of the e-mail to Kissinger.  Upon receiving the e-mail, Kissinger wrote the following to Joyce:

> I think this might just re-enforce the manager's observation of "high maintenance."  I don't know the particulars but I remember frequent escalated e-mails from Al over the years – some legit, some not – in almost every role he has held.  I would guess that going to HR is not the issue in this case – but skipping multiple levels in the chain of command is not uncommon for him – and not necessarily appropriate.  Right?

Id.  In a follow up e-mail to Joyce, Kissinger wrote:

_____

[8]      Plaintiff contends that he sent the presentation to several managers and HR representatives, but he provides no record support for the assertion.  See Plaintiff's Opposition (Doc. #44) at 5, ¶ 6.

12

> At one point years ago, we had a very similar situation with another guy – he had been coached on escalations over and over, and finally with the help of the law dept we chose to put him on warning since in essence, his failure to heed direction regarding the open door policy (we figured after 2/3 levels the issue had been appropriate[ly] dealt with) he was being insubordinate.  I think we ultimately fired him but I'm not certain – rather extreme, but not out of the question in the extreme.

Id.  Joyce understood that Kissinger was pointing out past precedent which supported possible termination under similar circumstances.

In 2004, Sprint underwent another RIF and eliminated several groups, including the CCTTE group.  In connection with the RIF, various managers in the impacted groups held a one-day meeting at a hotel to determine whether any positions would remain after the RIF, and if so, to select which employees would fill those positions.  Of the CCTTE group, Sprint retained the four oldest employees – Fields, Rigdon, Yeager and Smith – to fill other positions within Sprint.[9]  Sprint laid off the two youngest employees – plaintiff and Jacobson – effective May 6, 2004.[10]  At the time of his discharge, plaintiff was 49 years and 11 months old.  With respect to employees who worked in other groups which the RIF impacted, Sprint retained the following employees who held the same job title and grade level as plaintiff: John Hornbuckle, age 46; Gia Jackson, age 42; Jerri Stotts, age 37; Laura Umphenor, age 44; Edmond Vesques, age 33.[11]  See Candidate Selection Worksheet, Plaintiff's Exhibit R; Modica Depo. at 54:8 to 58:13, Plaintiff's Exhibit G.  The decision to discharge plaintiff was not based on the quality of his work performance.  See Modica Depo. at 62:12-15,

---

[9]     The record does not reflect what positions the employees held after the RIF.  Also, the record does not disclose the job titles or grade levels of Rigdon or Yeager, or the grade level of Fields.  Prior to the RIF, Smith held the same job title and grade level as plaintiff (program manager IV, level 77).

[10]     The record does not reflect Jacobson's job title or grade level.

[11]     The record does not disclose the positions and grade levels in which the employees worked after the RIF.

Plaintiff's Exhibit 5.

After the meeting at the hotel (i.e. after the managers had decided which employees to retain under the RIF), Sprint managers completed a document titled "Candidate Selection Worksheet," so that HR could go back and review the decisions which they had made. The document provided information regarding employees in groups which the RIF impacted, including name, supervisor, position, grade, years of service, performance rating history and subjective performance ratings by current supervisors.[12]  See Plaintiff's Exhibit Q. The document also contained password-protected information regarding military status, disability, gender, age and ethnicity.[13]  See Plaintiff's Exhibit R.

On February 1, 2005, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  In connection with the charge, plaintiff filled out a questionnaire regarding his allegations.  Plaintiff understood that it was important for him to be forthright, complete and accurate, and that he should not leave anything out or deceive the EEOC. The questionnaire asked plaintiff to outline all of his "protests of age discrimination including the content, to whom [he] complained, when and what action the employer took on [the] complaint." Defendant's Exhibit V ¶ 10.  Plaintiff listed the following events: (1) his e-mail to Forsee on June 7, 2003 titled "feudalism, fear and stagnation vs. freedom, empowerment and growth;" and (2) his e-

---

[12]     On a scale of one to five, with one being the best and five the worst, Fields rated plaintiff as follows: three on "Act With Integrity;" four on "Focus On The Customer;" three on "Deliver Results;" four on "Build Relationships;" and four on "Demonstrate Leadership."  Id. Fields' ratings were purely subjective; she did not consult with anyone regarding them, and she did not share them with plaintiff or record them in any other place.

[13]     Plaintiff contends that HR intended to protect the information with a password, but that it was easily obtainable by copying hidden cells and pasting them into a new spreadsheet. Plaintiff provides no information regarding who had access to the password or who easily obtained it.

mail to Joyce on November 18, 2003 titled "For the record."  In his deposition, plaintiff stated another communication which allegedly prompted retaliation: his meeting with Joyce on June 6, 2003, regarding Roberson's appointment as official WFM manager.  When asked why he did not inform the EEOC about the meeting, plaintiff responded, "That's a good question.  I'm not sure." Defendant's Exhibit A at 59:1-5.

Sprint employs a progressive discipline policy.  The first step is a verbal warning, which typically is not documented and expires after a pre-determined period of improved performance.  The second step is a written warning, which is documented with HR.  The third step is a final written warning, which usually entails a specific time frame for improved performance.  Plaintiff never received a verbal warning, written warning or any other type of corrective action from Smith, Curran, Barr or Fields.

During his employment at Sprint, plaintiff drafted a document called "The Hinds Sprint Chronicle Report" ("Hinds Report"), which outlined alleged unfair treatment of him.  Plaintiff maintained the document as events occurred, so that he would have a comprehensive set of information in case he ever needed to present it.  Plaintiff intended the document – which covered four pages in single-spaced, ten point font – to be as comprehensive and accurate as possible.

After Sprint terminated plaintiff's employment, plaintiff sent a copy of the Hinds Report to Kissinger and to the EEOC.  On the first page of the report, plaintiff included an introduction which stated as follows:

> The purpose of this document is to detail historical events, which have had an impact on the career of Al Hinds at Sprint.  Further, to report effects by existing Management, to document failure by Sprint to honor their affirmative action commitment to this Viet Nam Era Vet and to report anti-Mormon sentiment by at least one existing Sprint director.

Defendant's Exhibit S.  The introduction does not mention age discrimination.  In the body of the report, plaintiff raised concerns about many things, including (1) alleged anti-Mormon references by a Sprint executive; (2) alleged discrimination against veterans; and (3) alleged retaliation because plaintiff reported on the Sprint ethics hotline that he heard that one of his managers was intoxicated during a business trip.  Plaintiff did not mention age discrimination in the document, but he contends that his concerns regarding Vietnam veterans necessarily involve persons over the age of 40.

### Analysis

Plaintiff claims that defendant terminated his employment because of age and in retaliation for his complaints of age discrimination.  Defendant asserts that it is entitled to summary judgment because (1) plaintiff's claims are time barred; (2) plaintiff cannot establish a prima facie case or pretext on his age discrimination claim; and (3) plaintiff cannot establish a prima facie case on his retaliation claim.  The Court has ordered additional briefing on the age discrimination claim, see Order (Doc. #49), and addresses defendant's remaining arguments below.

**I.      Whether Plaintiff's Claims Are Time Barred**

Defendant asserts that plaintiff's claims are barred because he did not file administrative charges within 300 days of the challenged employment actions.  The ADEA requires that plaintiff file an administrative claim within 300 days of the challenged action.  See 29 U.S.C. §§ 626(d)(2) & 633(b); Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1174 (10th Cir. 1998).  Plaintiff filed his administrative charge on February 1, 2005.  Therefore, the charge is timely with respect to acts which occurred on or after April 7, 2004.

Defendant argues that plaintiff's deposition testimony shows that his claims involve employment actions which occurred before April 7, 2004.  Specifically, defendant points to

16

plaintiff's testimony that Sprint discriminated and/or retaliated against him by (1) not promoting him to WFM manager in May of 2003; and (2) transferring him to the CCTTE group effective January 1, 2004.  Because those acts are outside the 300-day period, defendant contends that such claims are time barred.

In the pretrial order, plaintiff asserts two theories of recovery: (1) that defendant discharged him because of his age; and (2) that defendant discharged him in retaliation for his complaints of age discrimination.  See Pretrial Order (Doc. #37) filed August 9, 2006 at 7-9.  Both claims involve the termination of plaintiff's employment, which occurred on May 6, 2006 – within 300 days of his administrative filing.[14]  Under D. Kan. Rule 16.2 (c), the pretrial order controls the course of the action unless modified by the parties and court.  Because the pretrial order does not assert claims regarding the failure to promote plaintiff or his transfer to the CCTTE group, those claims are not part of this case.  Therefore, the timeliness of plaintiff's administrative charge with respect to those claims is irrelevant.

Defendant contends that plaintiff's deposition testimony precludes him from claiming that his discharge was discriminatory or retaliatory.  Specifically, defendant points to plaintiff's testimony that he does not believe that Sprint eliminated the entire CCTTE group because of discrimination and/or retaliation against him.  See Plaintiff's Depo. at 133:20-134:1, Defendant's Exhibit A.  Defendant argues that this testimony binds plaintiff and that he cannot now contradict his sworn testimony to stave off summary judgment.  See Defendants' Memorandum In Support Of

---

[14]     The Court notes that the record does not disclose the date on which defendant notified plaintiff of its decision to terminate his employment.  See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006) (cause of action accrues on date employee is notified of adverse employment decision by employer).  Defendant does not assert that plaintiff's claims regarding the termination decision are untimely.

Motion For Summary Judgment ("Defendant's Memorandum") (Doc. #39) filed August 11, 2006 at 42. The deposition testimony which defendant cites, however, does not address plaintiff's claim that defendant chose to let him go – but retained other employees at the same job title and grade level – because of discrimination and/or retaliation. Counsel questioned plaintiff regarding how the RIF affected members of the CCTTE group, but counsel did not address how the RIF affected employees in other groups. See Plaintiff's Deposition at 38:5-41:1. Plaintiff agreed that he believed that he should not have been in the CCTTE group to begin with and therefore should not have lost his job, see id. at 41:6-25, but his testimony does not cover his beliefs regarding Sprint's retention of employees in other groups at the same job title and grade level. Defendant has not shown that plaintiff's deposition testimony is inconsistent with his claims in this case.

## II.   Retaliation

Plaintiff claims that defendant terminated his employment because he complained of age discrimination. The ADEA prohibits an employer from discriminating against an employee because he or she "has opposed any practice made unlawful" by the ADEA. 29 U.S.C. § 623(d). The burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), and Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56 (1981), applies to retaliation claims under the ADEA. See Lujan v. Walters, 813 F.2d 1051, 1058 (10th Cir. 1987). Plaintiff initially bears the burden of production to establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions. See Reynolds v. Sch. Dist. No. 1, 69 F.3d 1523, 1533 (10th Cir. 1995). If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude

18

that defendant's proffered reason is pretextual, that is, "unworthy of belief." Beaird, 145 F.3d at 1165 (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)).

Defendant maintains that plaintiff cannot establish a prima facie case of retaliation. To establish a prima facie case, plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) he suffered materially adverse action; and (3) a causal connection existed between the protected activity and the materially adverse action. See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (citing Burlington N. & Santa Fe Ry. Co. v. White, --- U.S. ----, 126 S. Ct. 2405, 2414-15 (2006)). Defendant contends that plaintiff cannot meet the first or third elements of a prima facie case.

### A.    Whether Plaintiff Engaged In Protected Activity

Defendant contends that plaintiff did not engage in protected activity because he did not make a sufficient complaint of age discrimination. As an initial matter, the Court agrees with defendant that the meeting between plaintiff and Joyce in June of 2003 is the only communication by plaintiff which is "remotely in the zone of ADEA protected activity."[15] Defendants' Summary Judgment Reply Brief (Doc. #48) filed October 3, 2006 at 27.

Defendant contends that plaintiff's query to Joyce is not sufficiently detailed to constitute protected opposition to age discrimination. To constitute protected activity, plaintiff must show that his complaint included allegations which could reasonably be construed as protected opposition to

---

[15]    Plaintiff does not address defendant's argument that his other communications – namely the Hinds Report; the power point presentation regarding the alpha rating process; the e-mail to Forsee on June 7, 2003; and the e-mail to Joyce on November 18, 2003 – do not constitute protected opposition. Plaintiff conclusively states that such activities are protected, see Plaintiff's Opposition (Doc. #39) at 35, but he provides no factual or legal analysis to support his conclusion. On this record, plaintiff has not shown that such activities constitute protected opposition under the ADEA. See, e.g., Jones v. UPS, 411 F. Supp.2d 1236, 1258-59 (D. Kan. 2006) (grievance or other activity which does not allege discrimination not protected).

age discrimination.  See Peterson v. Utah Dep't of Corr., 301 F.3d 1182, 1188 (10th Cir. 2002). Here, the record supports that on June 6, 2003, plaintiff met with Joyce and complained that Sprint should have posted the WFM manager position before appointing Roberson as "official" manager. During the meeting, plaintiff asked whether Sprint did not post the job because of age discrimination. While the factual record is admittedly slim, construed in a light most favorable to plaintiff, a genuine fact issue exists regarding whether defendant could have reasonably construed plaintiff's question as protected opposition to age discrimination.[16]

### B.      Whether Plaintiff Can Show A Causal Connection

Defendant contends that plaintiff cannot show a causal connection between his complaint of age discrimination and the termination of his employment.  Plaintiff may establish a causal connection with evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct followed closely by adverse action.  See Morgan v. Hilti, Inc., 108 F.3d 1319, 1325 (10th Cir. 1997) (plaintiff must show adverse employment action motivated by impermissible retaliatory or discriminatory animus).

Plaintiff asserts that after he complained to Joyce, a consistent "paper trail" demonstrates Sprints efforts to get rid of him.  Plaintiff's Opposition (Doc. #44) at 35.  Specifically, plaintiff asserts that after he complained on June 6, 2003, Sprint engaged in a pattern of retaliatory conduct which included (1) demoting him from grade 79 to grade 78; (2) transferring him to the CCTTE

---

[16]      Defendant also argues that plaintiff did not possess a reasonable good faith belief to question whether Sprint appointed Roberson because of age.  Specifically, defendant states that (1) plaintiff did not object when Sprint appointed Roberson "acting" manager; (2) Roberson is not significantly younger than plaintiff; and (3) plaintiff did not know Roberson's age.  In plaintiff's deposition, plaintiff testified that he did not know Roberson's age.  When counsel told him that Roberson is four years younger than plaintiff, plaintiff stated that he thought Roberson was much younger.  These facts do not prove as a matter of law that plaintiff's communication was not made in good faith.

group; and (3) giving him a lower performance rating.  See id.  As an initial matter, the record does not support plaintiff's assertion that defendant demoted him from grade level 79 to grade level 78.  When defendant transferred plaintiff to the CCTTE group in January of 2004, it demoted him from grade level 78 to grade level 77.  The Court presumes that this is the demotion to which plaintiff is referring.  Plaintiff argues that these actions, along with Kissinger's e-mails to Joyce on January 14, 2004, demonstrate that defendant acted with retaliatory motive.  See id. at 35-36.

Construed in a most favorable light, plaintiff presents the following events as evidence of a "pattern" of alleged retaliatory conduct:

- June 6, 2003 – plaintiff complained to Joyce about age discrimination.

- September of 2003 – Roberson gave plaintiff a low performance rating.

- January 1, 2004 – Sprint transferred plaintiff to the CCTTE group and demoted him from grade level 78 to grade level 77.

- January of 2004 – Roberson gave plaintiff a low performance rating.

- May 6, 2004 – Sprint terminated plaintiff's employment.

Temporal proximity between plaintiff's complaint and an adverse employment action may be persuasive evidence of retaliation.  See Annett v. Univ. of Kan., 371 F.3d 1233, 1240-41 (10th Cir. 2004); Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997).  Unless the employer's adverse action is closely connected in time to the protected conduct, however, plaintiff must produce additional evidence to show a causal connection.  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).  Here, eleven months transpired between the time of plaintiff's complaint and his discharge.  The Tenth Circuit has found that a six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month

21

period, standing alone, is insufficient.  MacKenzie v. City & County of Denver, 414 F.3d 1266, 1280

(10th Cir. 2005) (citing Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004)).

      Plaintiff asserts that the Court should look at the temporal proximity of all events in the

"pattern" of alleged retaliatory conduct.  See Plaintiff's Opposition (Doc. #44) at 34-36.  In so doing,

plaintiff cites Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996), in which the Tenth

Circuit found that the temporal proximity analysis must not be applied too restrictively where a

pattern of retaliatory conduct begins soon after the protected activity and only culminates later in

actual discharge.  In Marx, the employer began disciplining plaintiff within one month of the time

he filed a lawsuit, demoted him for lying about questions on a related questionnaire, used discovery

in his suit to dredge up information concerning unrelated wrongdoing, and ultimately discharged him

based on information revealed through discovery in the suit.  See id.  The Tenth Circuit found that

the pattern of actions taken by defendant precluded summary judgment regarding defendant's

motivation in demoting plaintiff and terminating his employment.  See id.

      Here, even if the Court considered the entire "pattern" of alleged retaliation, the first alleged

retaliatory act occurred at least four months after plaintiff complained to Joyce.  Standing alone, four

months between the protected activity and adverse action is insufficient to show causation.  See

MacKenzie, 414 F.3d at 1280.  Plaintiff presents no evidence that any of the decision-makers in the

alleged "pattern" of conduct knew about his age discrimination complaint to Joyce.  See Williams

v. Rice, 983 F.2d 177, 181 (10th Cir. 1993) (plaintiff must show that individuals who took adverse

action knew of protected activity).  On this record, plaintiff has not produced evidence sufficient to

raise a genuine fact issue as to whether a causal connection existed between his complaint to Joyce

and the termination of his employment.

**IT IS THEREFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u> (Doc. #38) filed August 11, 2006 be and hereby is **SUSTAINED in part.** The Court sustains the motion as to plaintiff's claim that defendant terminated his employment in retaliation for complaints of age discrimination. The motion remains pending as to plaintiff's claim that defendant terminated his employment because of age.

Dated this <u>12th</u> day of December, 2006 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge

23